# EXHIBIT 1



BERNEY & SANG
By:    David J. Berney, Esquire
Identification No.: 67882
        Jennifer Y. Sang, Esquire
Identification No.: 310617
8 Penn Center
1628 JFK Boulevard, Suite 1000
Philadelphia, PA 19103
(215) 564-1030


RECEIVED
JAN 0 7 2019
BY: ......................

Attorneys for Plaintiffs

=============================================================

| | | |
|---|---|---|
| Vivian Chen | : | |
| 5142 Haverford Avenue | : | |
| Philadelphia, PA 19139 | : | |
| | : | PHILADELPHIA COUNTY |
| v. | : | COURT OF COMMON PLEAS |
| | : | |
| University of the Sciences in Philadelphia | : | January Term, 2019 |
| 600 South 43rd Street | : | No. |
| Philadelphia, PA 19104 | : | |

=============================================================

## NOTICE TO DEFEND

### NOTICE

    You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

    YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

    IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE

PHILADELPHIA BAR ASSOCIATION
Lawyer Referral and Information Service
One Reading Center
Philadelphia,  Pa. 19107

Telephone:  (215) 238-6333

AVISO

Le han demando a usted en la corte. Si usted quire defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demandanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abagado y entregar a la corte en for escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende la corte tomara medidas y puede continuar la demandanda en contra suya sin previo aviso o notificacion. Ademas, la corte corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO, VAYA PERSONALMENTE O LLAME  POR TELEFONO A LA OFICINA MENCIONADA A CONTINUACION. ESTA OFICINA LE  PUEDE PROVEER LA INFORMACION NECESARIA PARA CONTRATAR A UN ABOGADO.

SI USTED CARECE  DE  LOS MEDIOS NECESARIOS PARA CONTRATAR A UN ABOGADO,  DICHA OFICINA LE PUEDE SUMINISTRAR LA INFORMACION NECESARIA ACERCA DE AQUELLAS AGENCIAS QUE  OFRECEN SERVICIOS LEGALES A Las PERSONAS QUE TIENEN DERECHO A RECIBIR TAL AYUDA GRATIS O A UNA CUOTA REDUCIDA.

ASOCIACION DE LICENCIADOS
DE FILADELFIA
Servicio De Referencia E Informacion Legal
Uno Reading Centro
Filadelfia, Pennsylvania 19107
Telefono: (215) 238-6333

2

BERNEY & SANG
By:    David J. Berney, Esquire
Identification No.: 67882
       Jennifer Y. Sang, Esquire
Identification No.: 310617
8 Penn Center
1628 JFK Boulevard, Suite 1000
Philadelphia, PA 19103
(215) 564-1030                                    Attorneys for Plaintiffs
===============================================================

Vivian Chen                          :
5142 Haverford Avenue                :
Philadelphia, PA 19139               :
                                     :        PHILADELPHIA COUNTY
          v.                         :        COURT OF COMMON PLEAS
                                     :
University of the Sciences in Philadelphia  :   January Term, 2019
600 South 43rd Street                :        No.
Philadelphia, PA 19104               :
===============================================================

## **COMPLAINT**

### **INTRODUCTION**

1.    Plaintiff is Vivian Chen, who resides at 5142 Haverford Avenue, Philadelphia, PA

19139.

2.    Defendant is the University of the Sciences in Philadelphia, a private university

which can be served at 600 South 43rd Street, Philadelphia, PA 19104.

3.    Ms. Chen enrolled in the University's College of Pharmacy in 2012.

4.    In enrolling in the University and paying the University tuition, Ms. Chen entered

a contract with the University.

5.    The University's student handbooks, course catalog, and website, among other

things, set forth the terms of the contract.

6.      Ms. Chen progressed through her coursework and achieved above-average grades through the end of the 2015-2016 school year.

7.      In 2016 and 2017, however, the University materially breached its contract with Ms. Chen, causing her to suffer damages and thwarting her education.

## FACTS

I.    **The University had a contractual duty to accommodate Ms. Chen's disabilities, engage in an interactive process with her to identify accommodations, and refrain from discriminating against or harassing her.**

8.      In 2007, when Ms. Chen was in eighth grade, she was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), Obsessive Compulsive Disorder (OCD), and Generalized Anxiety Disorder.

9.      In 2012, Ms. Chen was also diagnosed with idiopathic hypersomnia, a sleep disorder.

10.     Since middle school, Ms. Chen has seen a psychiatrist.  Ms. Chen's psychiatrist has treated her disabilities by prescribing her medication such as Adderall and Prozac.

11.     In middle school and high school, Ms. Chen received accommodations to address her disabilities.

12.     Ms. Chen also received accommodations for her college-entrance examinations (i.e., the SAT and the ACT).

13.     In March 2012, the University's College of Pharmacy accepted Ms. Chen.

14.     The College of Pharmacy is a six-year program that results in a Doctor of Pharmacy degree.

15.     In August 2012, Ms. Chen enrolled in the College of Pharmacy.

16.     Ms. Chen's expected graduation date was therefore in spring 2018.

17.     The University has a university-wide student handbook (University-wide handbook).  *See* Exhibit A.

18.     The University-wide handbook comprises part of the contract between Ms. Chen and the University.

19.     The University had the University-wide handbook in effect when Ms. Chen enrolled in the University.

20.     The University had the University-wide handbook in effect throughout Ms. Chen's enrollment in the University.

21.     The College of Pharmacy has a student handbook (Pharmacy handbook).  *See* Exhibit B.

22.     The College of Pharmacy had the Pharmacy handbook in effect when Ms. Chen enrolled in the University.

23.     The University had the Pharmacy handbook in effect throughout Ms. Chen's enrollment in the University.

24.     The Pharmacy handbook supplements the University-wide handbook and comprises part of the contract between Ms. Chen and the University.

25.     In exchange for Ms. Chen's tuition payments, the University agreed to fulfill the terms of the handbooks.

26.     The University distributed the University-wide handbook to Ms. Chen when she enrolled in the University.

5

27.     The University distributed the University-wide handbook to Ms. Chen each year of her enrollment at the University.

28.     The University distributed the Pharmacy handbook to Ms. Chen when she enrolled in the University.

29.     The University distributed the Pharmacy handbook to Ms. Chen each year of her enrollment.

30.     The University had a contractual duty to Ms. Chen to fulfill the terms of the University-wide handbook.

31.     The University had a contractual duty to Ms. Chen to fulfill the terms of the Pharmacy handbook.

32.     The University-wide handbook states that the University will provide reasonable accommodations to all students who have documented disabilities.

33.     The University-wide handbook states that the University will comply with Section 504 of the Rehabilitation Act of 1973.

34.     The University-wide handbook states that the University will comply with the Americans with Disabilities Act (ADA).

35.     The ADA requires entities to, among other things, accommodate individuals with disabilities and engage in an interactive process to identify and provide individuals with disabilities accommodations.

36.     The University-wide handbook states that the University will comply with the ADA Amendments.

37.    The University-wide handbook states that the University will not discriminate against students.

38.    The University-wide handbook states that the University will not harass students.

39.    The University-wide handbook defines "discrimination" more broadly than state and federal law, defining it as "[t]he failure to treat similarly situated people in the same way because of a bias or prejudice."

40.    The University-wide handbook defines "harassment" more broadly than state and federal law, defining it as "[a] form of discrimination that is defined as unwelcome conduct directed toward an employee or student when (a) "[s]uch conduct creates an intimidating, hostile, or offensive academic, employment, or living environment; (b) "[s]ubmission to, or rejection of, such conduct by an individual is used as a basis or factor in decisions affecting the terms or conditions of employment or education of any individual"; (c) "[s]ubmission to, or rejection of, such conduct by an individual is used either explicitly or implicitly as a basis for academic or employment decisions affecting the individual"; or (d) "[s]uch conduct has the purpose or effect of unreasonably interfering with an individual's academic or work performance."

## II.    With the University fulfilling its duties to her, Ms. Chen excelled during her first four years in the College of Pharmacy program.

41.    At the start of the 2012-2013 school year, Ms. Chen requested that the University accommodate her disabilities.

42.    The University approved Ms. Chen's request for accommodations.

43.    The University provided Ms. Chen (a) extended time for examinations (no more than 50% of the regular time); (b) examinations in a separate testing environment; and (c) extended time for assignments (no more than two extra days).

44.     Ms. Chen required these accommodations because her ADHD and OCD interfere with her ability to focus, and her anxiety disorder causes her stress in certain academic settings.

45.     In August 2015, at the start of Ms. Chen's fourth year in the College of Pharmacy program, the University provided her an additional accommodation: a student note-taker for lecture courses because her OCD symptoms of rechecking and rereading interfered with her ability to take contemporaneous notes during a lecture.

46.     On or about October 8, 2015, Ms. Chen's psychiatrist sent a letter to the University certifying that Ms. Chen is under treatment and stating that the psychiatrist recently performed a comprehensive psychiatric evaluation of Ms. Chen.

47.     The psychiatrist's letter listed Ms. Chen's types and dosages of prescribed medication.

48.     In the letter, the psychiatrist also made recommendations for accommodations in the educational setting.

49.     The University did not raise any concerns regarding Ms. Chen's medications.

50.     Ms. Chen took the medications during her first four years in the College of Pharmacy program.

51.     From the 2012-2013 school year through the 2015-2016 school year, Ms. Chen maintained above-average grades.

52.     From the 2012-2013 school year through the 2015-2016 school year, Ms. Chen progressed through the College of Pharmacy program.

53.     Ms. Chen made the Dean's list during her first four years in the College of Pharmacy program.

8

54.     Ms. Chen was never placed on academic probation during her first four years in the College of Pharmacy program.

55.     During her time at the University, Ms. Chen worked as a pharmacy intern at Bryn Mawr Hospital and CVS Pharmacy, where she worked in direct patient care.

56.     Ms. Chen was successful in those positions.

57.     Ms. Chen took three courses in her first few years that require public speaking, for which she received two As and a B.

58.     In those courses, the professors allowed her to use notecards as accommodations.

59.     Ms. Chen requires notecards because of her OCD, ADHD, and anxiety symptoms. For example, if she misses a detail during a presentation, she will perseverate on it because of her OCD. Notecards help refocus her, allowing her to continue with the presentation. Further, the presence of notecards helps allay her anxiety symptoms since they afford her ready access to the information that she must discuss.

**III.    The University breached its contractual duties to Ms. Chen in 2016 and 2017, causing her to suffer damages and thwarting the education that she paid for.**

60.     During the fall semester of the 2016-2017 school year, Ms. Chen was enrolled in "Introductory Pharmacy Practice Experiences" (IPPE), a course that met at an off-campus location at 6:45 am.

61.     The timing of Ms. Chen's medication made it difficult for her to safely drive to IPPE, so she met with her deans, Dean Laura Mandos and Dean Ross Radish.

62.     During the meeting, Ms. Chen offered information related to her medication, including the types and dosages of medication that she was prescribed.

9

63.    Dean Mandos told Ms. Chen that she believed the dosages of Ms. Chen's stimulant medications, Modafinil and Adderall, were too high.

64.    Ms. Chen's dosages had been set since 2012.

65.    Three psychiatrists had approved the dosages.

66.    No pharmacist ever questioned the dosage when filling Ms. Chen's prescriptions.

67.    Ms. Chen explained to the deans that she has never had an issue with the dosage and that her medication helps her perform her daily functions, but the deans ignored her.

68.    The deans instead subjected Ms. Chen to discriminatory treatment and harassment, singling her out based on her disabilities and medication.

69.    The deans threatened that if Ms. Chen did not take a medical leave and officially withdraw from all of her courses that semester, she would receive an F in her IPPE course.

70.    The deans engaged in no interactive process with Ms. Chen to identify other potential accommodations rather than withdraw so that Ms. Chen could continue with the program.

71.    The deans provided Ms. Chen no accommodations.

72.    Ms. Chen declined to take a medical leave.

73.    The deans then required Ms. Chen to provide documentation from her clinicians stating that she was well enough to continue her coursework.

74.    The deans also required Ms. Chen to meet with a University professor to discuss her "use of caffeine."

75.    Ms. Chen produced the requested documentation.

76.     Ms. Chen met with a University professor, Professor Downs, pursuant to the deans' orders.

77.     To ameliorate the deans' concerns, Ms. Chen requested that her psychiatrist decrease the dosages of her stimulant medications.

78.     Because of the stressful school environment created by the deans, Ms. Chen had to increase her anxiety medication.

79.     Ms. Chen finished the fall 2016 semester with mostly As and Bs in her classes, but the University, pursuant to the deans' threat, gave her an F in her IPPE course.

80.     The University continued discriminating against and harassing Ms. Chen, as those terms are defined by Ms. Chen's contract with the University.

81.     The University required Ms. Chen to obtain a substance abuse evaluation from Livengrin, an addiction treatment and detox rehabilitation center, before she could retake IPPE.

82.     Ms. Chen requested permission to obtain the substance abuse evaluation from other similar addiction treatment and detox rehabilitation centers because Livengrin was not covered by her health insurance.

83.     The University rejected Ms. Chen's request.

84.     On or about February 15, 2017, Ms. Chen met with Livengrin.

85.     On February 23, 2017, the University informed Ms. Chen that (a) Ms. Chen needed to sign a release of medical information so that Livengrin could communicate with her clinicians; (b) Ms. Chen needed to sign a release of consent so that her deans could speak with Livengrin and her clinicians; and (c) once the deans had a letter stating that Ms. Chen's

clinicians have heard Livengrin's recommendations and feel that Ms. Chen is cleared to complete direct patient care activities, then Ms. Chen will be allowed to complete IPPE.

86.     Thereafter, Ms. Chen contacted Livengrin to provide her consent for it to communicate with her physicians.

87.     Livengrin informed Ms. Chen that it decided that it was more appropriate for her psychiatrist to oversee her health and to make medical recommendations.

88.     In the spring 2017 semester, Ms. Chen enrolled in "Seminar in Professional Practice," a course that was required and that had a public speaking component.

89.     Upon information and belief, the seminar is no longer required for the Class of 2022.

90.     The seminar is only a one-credit course.

91.     Ms. Chen met with the professor of the seminar at the start of the semester to discuss accommodations for her disabilities.

92.     Ms. Chen informed the professor about the nature of her disabilities.

93.     Grades in the seminar are largely determined by the content and delivery of a final presentation.  The presentation makes up 65% of the final grade.

94.     Students were allowed to use notecards during the presentation, but using them would result in a lower grade.

95.     In a departure from the seminar's class policy, Ms. Chen's professor refused to allow Ms. Chen to use notecards at all.

96.     Ms. Chen asked for permission to use notecards during the presentation as an accommodation for her disabilities, but the professor denied the request without engaging in any interactive process with Ms. Chen.

97.     Ms. Chen was not afforded any accommodations for her disabilities in the seminar.

98.     On February 17, 2017, the day of Ms. Chen's presentation, she had intense anxiety, stemming from her anxiety disorder.

99.     She then suffered extreme abdominal pain and had to rush to the hospital.

100.    The hospital performed an ultrasound which identified two tumors.  Surgery was required.

101.    Ms. Chen was scheduled to present at 9:00 am, but she could not make it due to her medical emergency.

102.    At 9:15 am, Dean Mandos called and left a voicemail for Ms. Chen, and at 9:54 am, she emailed Ms. Chen asking Ms. Chen to contact her because Ms. Chen was not in the seminar.

103.    Ms. Chen emailed Dean Mandos that she was in the hospital.

104.    Dean Mandos responded that Ms. Chen "MUST follow policy regarding absences from seminar."

105.    Ms. Chen also called her seminar professor.  The professor told her not to worry and to bring documentation the following week.

106.    On February 27, 2017, Ms. Chen met with the professor to update the professor on her medical condition and to submit medication documentation.  The professor told Ms. Chen

13

that the absence on February 17, 2017 was not excused because Ms. Chen did not notify her in advance of the class.

107.    The professor also told Ms. Chen that "pharmacy is not for everyone."

108.    Because Ms. Chen's absence on the day of her presentation was not considered excused, she was permitted to give only a make-up presentation in front of two faculty members rather than her classmates.  The highest grade she could receive for the presentation was 75%.

109.    On March 16, 2017, Ms. Chen asked the professor to reconsider her position on the absence.

110.    The professor ignored the request.

111.    Ms. Chen was scheduled to do her make-up presentation on April 21, 2017.

112.    Ms. Chen requested to be permitted to bring up notecards in case she needed to reference them, but the professor denied the request without engaging in any interactive process.

113.    As a result, Ms. Chen suffered a panic attack at the time of her presentation, and the professors at the presentation took her to the University health center for psychiatric treatment.

114.    Ms. Chen's seminar professor again told Ms. Chen that "pharmacy is not for everyone."

115.    On April 24, 2017, Ms. Chen made a request to the University's Student Accommodations office for ADA accommodations for the presentation.

116.    Ms. Chen's private therapist also sent an email to the office explaining Ms. Chen's anxiety and why she needed notecards during the presentation.

14

117.    On May 1, 2017, the University informed Ms. Chen that she would not be given a chance to make up the presentation.  Instead, Ms. Chen would receive a failing grade for the seminar.

118.    One of Ms. Chen's male classmates in the seminar had also failed his presentation, but the University provided him a second opportunity to present without any penalties to his scores because a spider had bitten him before his first presentation.

119.    Despite the University subjecting Ms. Chen to disparate treatment and giving her a failing grade on her presentation, Ms. Chen took the final exam for the seminar.

120.    The professor never gave Ms. Chen her exam grade.

121.    Because the seminar was a required course for Ms. Chen, she retook it in summer 2017.

122.    Before the summer session, Ms. Chen repeatedly requested that the University provide her accommodations for the seminar.

123.    On August 10, 2017, Ms. Chen met with the professor for the summer session seminar to discuss the class, including her request for accommodations for the presentation.

124.    The professor denied Ms. Chen's request, telling her just "do your best."

125.    Because Ms. Chen was given no accommodations, such as extra time or being able to refer to notes on index cards, Ms. Chen worked with her therapist and psychiatrist on Cognitive Behavior Therapy techniques and tried Exposure and Response Prevention to ease her anxiety and OCD symptoms.

126.    Because Lorazepam was prescribed to Ms. Chen to help her manage her anxiety for her presentation, Ms. Chen took it for the first time prior to the presentation.

15

127.    The Lorazepam slowed Ms. Chen's motor movements and speech, and she was unable to deliver her presentation within the twenty-minute time limit for the presentation.

128.    The professor gave Ms. Chen a failing grade because she exceeded the time limit.

129.    The University did not afford Ms. Chen a second opportunity to present.

130.    As such, Ms. Chen failed the seminar for a second time.

131.    Under University policy, if a student receives a failing grade in the same course twice, the University drops her from its rolls.  Students who are dropped from the rolls for failing the same course twice are eligible to reapply for readmission to a different program at the University, contingent on program capacity and the ability to demonstrate likely success in the new program.

132.    However, on at least one other occasion, a male student was permitted to take the seminar a third time without having to apply for readmission.

133.    On August 30, 2017, the University notified Ms. Chen that because she failed the seminar twice, she was dropped from the rolls.

134.    On September 25, 2017, Ms. Chen's psychiatrist sent the University a letter explaining the effects of Lorazepam and Ms. Chen's need for accommodations in the education setting.

135.    The University did not respond.

136.    Ms. Chen did not attend the University during the 2017-2018 school year.

137.    On August 29, 2018, Ms. Chen filed an appeal with the University, asking it to reconsider its decision to drop her from the rolls and asking it to allow her to deliver her seminar presentation with accommodations.

16

138.    Before Ms. Chen filed her appeal, the University had given her an outdated policy with no deadlines for the appeals process.

139.    Under the correct policy (the updated policy), Ms. Chen's appeal was untimely.

140.    Because Ms. Chen was given the outdated policy, however, the University permitted her appeal.

141.    On September 28, 2018, the University informed Ms. Chen that her appeal was denied.

142.    The University told Ms. Chen that she would have to apply for readmission.

143.    On November 5, 2018, at a meeting with Ms. Chen, the University informed her that should she be readmitted, she would have to retake all of her fifth year courses, even those in which she achieved As and Bs.

## IV.    The University's breach of contract has caused Ms. Chen to suffer significant damages.

144.    The University's breach of contract has caused Ms. Chen to suffer damages in the form of lost tuition payments.  She paid tuition in 2016 and 2017 but did not receive the benefit of her bargain: an education that complies with the University's student handbooks.

145.    The University's breach of contract has caused Ms. Chen to suffer damages in the form of costs and expenses that she incurred in attempting to comply with the University's discriminatory requirements and in attempting to proceed with her education without reasonable accommodations.

146.    The University's breach of contract has caused Ms. Chen to suffer damages by preventing her from working as a pharmacist.

17

147.    Ms. Chen has successfully completed pharmacy internships, including at CVS Pharmacy and the Food and Drug Administration (FDA).

148.    The FDA offered Ms. Chen a full-time position as a pharmacy officer in the U.S. Public Health Service contingent on her graduation from the University.

149.    If not for the University's breach of contract, Ms. Chen would have graduated in spring 2018 and begun employment with the FDA or another entity.

150.    The University's breach of contract has caused Ms. Chen to suffer emotional distress and pain and suffering.

## COUNT I – BREACH OF CONTRACT

151.    Ms. Chen incorporates the above and below paragraphs as though fully set forth herein.

152.    The University had a contractual duty to provide Ms. Chen reasonable accommodations for her disabilities.

153.    The University breached its duty to provide Ms. Chen reasonable accommodations.

154.    The breach was material.

155.    As a result of the breach, Ms. Chen has incurred damages.

156.    The University had a contractual duty to engage in an interactive process with Ms. Chen to identify and provide her reasonable accommodations.

157.    The University breached its duty to engage in an interactive process with Ms. Chen to identify and provide her reasonable accommodations.

158.    The breach was material.

18

159.   As a result of the breach, Ms. Chen has incurred damages.

160.   The University had a contractual duty to refrain from discriminating against Ms. Chen.

161.   The University breached its duty to refrain from discriminating against Ms. Chen.

162.   The breach was material.

163.   As a result of the breach, Ms. Chen has incurred damages.

164.   The University had a contractual duty to refrain from harassing Ms. Chen.

165.   The University breached its duty to refrain from harassing Ms. Chen.

166.   The breach was material.

167.   As a result of the breach, Ms. Chen has incurred damages.

168.   The University's breaches together were material and caused Ms. Chen to incur damages.  Ms. Chen's damages include but are not limited to the loss of bargained for benefits under the parties' contract, the loss of educational opportunity, wage loss and future wage loss, emotional distress and pain and suffering.

WHEREFORE, Plaintiff Vivian Chen demands judgment and declaratory judgment against Defendant University of the Sciences; damages resulting from the University's contractual breaches; compensatory damages; consequential damages; specific performance, including the immediate and full reinstatement in the College of Pharmacy program with access to reasonable accommodations, removal from her academic record of the failing grades that she received as a result of the University's breaches, and recognition of all course credits that she has obtained thus far; attorney's fees and litigation costs; and all other such relief that this Court deems appropriate.

RESPECTFULLY SUBMITTED,

_____

DAVID J. BERNEY, ESQUIRE
JENNIFER Y. SANG, ESQUIRE
Berney & Sang
8 Penn Center
1628 JFK Boulevard, Ste. 1000
Philadelphia, PA 19103
djberney@berneylaw.com
215-564-1030 (office)
215-751-9739 (fax)

Attorneys for Plaintiff

Dated: January 7, 2019

# Exhibit A



# University of the Sciences

## 2015 – 2016

# STUDENT HANDBOOK

Property of: _____

Address: _____

Phone #: _____

E-mail: _____

In case of emergency, please notify:

_____        _____
         Name                          Phone #

*Students are responsible for knowing the information, policies and procedures outlined in this document. The University reserves the right to make changes to this code as necessary and once those changes are posted online, they are in effect. Students are encouraged to check online www.usciences.edu/studenthandbook for the updated versions of all policies and procedures.*



**USciences**
**University of the Sciences**

Dear University of the Sciences Student:

Welcome, and thank you for choosing to join the community of learners at University of the Sciences! As a student member of the University community you are following in the tradition of many professionals who can be found among the top leaders of the world within the fields of science, healthcare, and healthcare business and policy.

During your educational experience I encourage you to explore all that University of the Sciences has to offer. To assist you in achieving your personal and professional goals you are invited to fully utilize the many programs, activities, and services available through Student Affairs. Many departments and functional units make up Student Affairs including: Academic Advising, Campus Recreation, Career Services, Civic Engagement, Multicultural Affairs and International Student Services, Student Academic Support Services, Student Accommodations, Student Activities, Student Conduct, Student Health and Counseling, Student Life, and the Dean of Students Office.

This Student Handbook is designed to acquaint you with the information you will need to effectively navigate all of the resources that are available to you on campus. Also included in this Handbook are policies and procedures that are required reading for all University students. As a member of the University you are now also a citizen with rights and responsibilities. You are therefore obligated to adhere to and practice the policies and procedures outlined for all University students, as well as find meaningful ways in which you can continue to strengthen the community where you will live, learn, work, and play.

Finally, the University is a diverse environment comprised of individuals from different backgrounds and cultures; yet in one very important aspect all students are similar—each student attending the University has hopes and aspirations for the future. At University of the Sciences we are an inclusive community and we value each student for their individual contribution to the richness of this learning environment.  It is our hope for all students to use this opportunity to learn from one another about each other.

Student Affairs is housed on the first floor of Whitecar Hall.  Stop in or call us at 215.596.8950. I look forward to getting to know you over the next several years. Best wishes for a bright future.

Sincerely,

William G. Cunningham, PhD
Associate Vice President for Student Affairs
Dean of Students



**USciences**
**University of the Sciences**

Dear Classmates,

It is both, my pleasure and my honor, to welcome you to the 2015-2016 school year at University of the Sciences. The USciences community is small and thus resembles one big extended family. No matter what year you are going in and what major you are studying, I am confident that this year holds many opportunities for you. Welcome to those joining us here for the first time, and welcome back to those returning.

Regardless of what year in your program you are entering, I urge you to make time for new experiences because when you leave this campus you are not going to remember cramming for an exam the night before or getting a poor grade on that one test. Instead, you will remember the people you met, the places you went, and the clubs in which you were active. An Admissions counselor once told me that they used to joke back in college that her husband majored in Student Government. While, I am not telling you to forget about your education, I do urge you to find an organization that resonates with you to that extent. Find something that you are as passionate about as you are about your academic program, and dive into it with all your heart to balance out the school work load. I encourage you to learn what USciences offers and this Student Handbook can serve as the first step. It contains not only the campus life details, but also information on academics, student services, and other campus resources.

Remember, that as part of the extended student body family, you are automatically represented by the Student Government Association which exists to serve and benefit you. Due to the small size of the school, and the close knit environment here at University of the Sciences, SGA has a significant impact on the issues and policies affecting current and future students of the institution. If you ever have any questions or concerns please feel free to stop by our office in Wilson Hall Room 218 or contact me directly at ikatz@mail.usciences.edu. I wish you only the best in this academic year.

Sincerely,

*Irina Katz*

Irina Katz
Student Government Association President

# GENERAL INFORMATION

## University Mission

University of the Sciences prepares students to become leaders, innovators, and skilled practitioners in the sciences, the health professions, and related disciplines.  We deliver excellence in teaching, research, and service.

## University Vision

University of the Sciences will be recognized as a leader of healthcare education and research.  We provide interdisciplinary, collaborative educational experiences and global opportunities that inspire our graduates, faculty, and staff to promote positive change.  Graduates will be pursued because they are compassionate healthcare providers, critical thinkers, and diplomats of change, effecting innovative transformation for the betterment of society.

## University Values

- We champion innovation in inter-professional education, teaching, and research.

- We embrace scholarship, developing technology, and life-long learning.

- We foster entrepreneurship, professionalism, and collaboration, building upon our proud legacy as the first pharmacy school in the country.

- We cultivate respect, diversity, citizenship, civility, and inclusiveness.

- We pursue quality, integrity, and sustainability in all aspects of university life.

- We support our community and contribute to its economic vitality.

## Strategic Goals* 2013-2018

- Achieve academic preeminence and a reputation for excellence among peers

- Enhance enrollment management, from student recruitment through graduation and beyond

- Diversify and enhance revenue streams, and contain costs

- Develop and sustain human and facility/capital resources

- Enhance research capabilities and outcomes through collaboration

*Strategic Goals include Transformative Initiatives as action items/strategies

And recent alumni have showcased many talents:

- Riolama Lorenzo HS'06 who retired after a career as Pennsylvania Ballet's principal dancer
- Mayank Amin PharmD'09 who, when he is not practicing pharmacy, is acting in Bollywood type films and was a featured extra in M. Night Shyamalan's *The Last Airbender*

Today, the University continues to build on the founders' esteemed reputation and is now home to over 30 degree-granting programs and 27 minors. Its nearly 2,800 students have enrolled in premier programs in the health sciences, ranging across pharmacy to pre-med to physical therapy to healthcare business and health policy. At USciences, students can study almost the entire range of health sciences in one of its four colleges:

- Philadelphia College of Pharmacy
- Misher College of Arts and Sciences
- Samson College of Health Sciences
- Mayes College of Healthcare Business and Policy

## Student Affairs

### Mission Statement and Goals

The Division of Student Affairs contributes to the mission of the University through the development of students as leaders, innovators, and practitioners through quality student-centered programming and services that support their emotional, intellectual, personal, and ethical growth.

To accomplish its mission, Student Affairs focuses on programs and services to:

- Support the student in scholarly pursuits and the pursuit of career and personal aspirations
- Enhance student learning
- Promote student development
- Promote a shared sense of community
- Facilitate the development of life skills
- Create and maintain a support network that includes partnerships among faculty, administration, and staff
- Engage students in opportunities for productive citizenship
- Promote the health and well-being of students
- Encourage an environment that is inclusive and respectful of individual differences
- Develop a viable organization that is responsive to the needs of students and proactive in its preparation of students for the future

Students unable to complete experiential education requirements due to lack of compliance with the Criminal Background Check Policy or due to a positive criminal record incompatible with experiential placement will be withdrawn from their academic program and, if they choose to continue their studies at University of the Sciences, will be required to change their major to another program.

Students are responsible for all costs associated with criminal background checks. Students should direct any questions about their academic program's specific requirements under this policy to their program directors or college deans.

## Digital and Internet Communications Policy

All digital and internet communications utilizing the University of the Sciences or USciences name, the name of a University organization, or the name of a University event must be approved by the Marketing Department prior to deployment.

## Disability Services Policy

University of the Sciences recognizes that a diverse campus community is essential to enriching intellectual exchanges and enhancing cultural understanding and, as such, values equality of opportunity, mutual respect, and an appreciation of diversity. Therefore, the University is committed to providing reasonable accommodations to all members of the University community who have documented disabilities.

Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act (ADA), and the ADA Amendments (ADAAA) prohibit discrimination against qualified individuals with disabilities in the programs, services, and activities of public entities, including post-secondary institutions. Therefore, the University has both a legal obligation and an ethical commitment to provide reasonable accommodations for otherwise qualified individuals. This applies to virtually all aspects of campus activities, including employment, academic studies, student programming, and services provided to the community at large. The University's reasonable accommodation process is intended to provide reasonable support to meet the individual needs of this diverse population, which includes prospective and enrolled students involved in the University's services and programs. Accommodations may be altered based on the student's needs; changes in the law; or changes in the University's curriculum, programs, job requirements, or services.

If you are a student who may have a disability and would like to request accommodations, please contact the Office of Student Accommodations (Whitecar Hall, Suite 1110) at 215.596.8758.

### Appeals Policy

University of the Sciences has both a legal obligation and an ethical commitment to support the rights of persons with disabilities to equal access. As such, the following policy has been established for students who believe they have been denied reasonable and appropriate accommodations by a responsible agent of the University.

Any student with a documented disability for which they need and have requested accommodations should contact the Office of Student Accommodations (OSA) if he or she experiences any of the following situations:

- Denial of reasonable accommodations
- A delay in the implementation of an approved accommodation
- Denial of an approved accommodation
- Any discrimination due to an approved accommodation

Students should contact the OSA within ten (10) business days of the alleged denial and/or violation. The OSA will work with students to try to informally resolve any concerns. If the informal approach does not result in a mutually agreeable outcome, the student may appeal the unresolved issue in writing to the University's Affirmative Action Officer (AAO). A written Letter of Appeal must be submitted within thirty (30) business days of the last meeting with the OSA to the following address:

Department of Human Resources, Affirmative Action Officer
University of the Sciences
600 South 43rd Street
Philadelphia, PA 19104

The Letter of Appeal must include the following information:

- Student's name, address, and University ID number
- Description of the alleged denial and/or violation
- Additional supporting information
- Desired outcome

Upon receiving the Letter of Appeal, the AAO will investigate the complaint and render a decision within ten (10) business days. The determination will be provided to the student in writing at that time. The AAO's decision is final and cannot be appealed.

Students who are not satisfied with the AAO's decision may file a formal grievance against the University or a written complaint with the Office of Civil Rights, Department of Education.


**Discrimination and Harassment Policy**

### Policy Statement

Discrimination, harassment, and related retaliation are prohibited. University of the Sciences is committed to maintaining a positive learning, working, and living environment in which all individuals are treated with respect and dignity. Each individual has the right to work and learn in a professional atmosphere that promotes equal employment and learning opportunities and prohibits discriminatory practices, including harassment; therefore, the University expects all relationships among persons in the workplace and/or learning environment to be professional and free of bias, prejudice, and harassment.

This policy exceeds the requirements of applicable law as our policy offers protection to all individuals in circumstances that might not be determined to be illegal. Thus, bullying, stalking, discrimination, and harassment—which do not meet all of the criteria for unlawful discrimination or unlawful harassment—are also prohibited under this policy. Discrimination and harassment are also illegal under certain circumstances.

*Discrimination*:
The University does not discriminate in the admission, employment, or administration of its programs on the basis of gender, pregnancy, age, disability, race, color, religion, creed, national origin, veteran status, marital status, sexual orientation, gender identity, or in violation of federal, state, and local laws or executive orders.

*Harassment:*
The University does not tolerate harassment, in any form, including the creation of an intimidating, hostile, or offensive working, learning, or living environment.

*Retaliation:*
The University will neither engage in, nor tolerate, retaliation of any kind against any individual who makes a complaint of prohibited discrimination or harassment or against anyone who serves as a witness or who otherwise participates in the investigatory process.

The Affirmative Action OfficeRs (AAO) is responsible for addressing all grievances related to discrimination and sexual harassment and, in cooperation with the Office of Human Resources and the Division of Student Affairs, seeks to support and advance these principles by providing leadership and coordination to ensure that the University adheres to equal opportunity, affirmative action, and nondiscrimination policies.

For questions and concerns regarding affirmative action or equal employment opportunity policies, please contact: Affirmative Action Officer, Marcia Conrad at 215.596.7533

## Policy Purpose

This policy was established to provide methods for addressing and resolving complaints of discrimination, harassment, and/or retaliation in accordance with University policy.

## Policy Definitions

*Complainant*: A person who is subject to alleged discrimination, harassment, or related retaliation.

*Respondent*: A person whose alleged conduct is the subject of a complaint.

*False Complaint or False Information:* Occurs when a person knowingly or recklessly alleges a false complaint of discrimination, harassment, or related retaliation or provides false information during the course of an investigation.

*Discrimination:* The failure to treat similarly situated people in the same way because of a bias or prejudice.

*Unlawful Discrimination:* Discrimination is unlawful when directed toward a person because they are a member of a protected class, which results in an adverse employment or academic action.

*Harassment:* A form of discrimination that is defined as unwelcome conduct directed toward an employee or student when:

- Such conduct creates an intimidating, hostile, or offensive academic, employment, or living environment
- Submission to, or rejection of, such conduct by an individual is used as a basis or factor in decisions affecting the terms or conditions of employment or education of any individual
- Submission to, or rejection of, such conduct by an individual is used either explicitly or implicitly as a basis for academic or employment decisions affecting the individual
- Such conduct has the purpose or effect of unreasonably interfering with an individual's academic or work performance

There are many types of harassment, including but not limited to, sexual, racial, bullying, psychological, religious, stalking, and physical assault. The conduct that creates harassment can be verbal, physical, visual, or retaliatory.

*Unlawful Harassment:* Harassment based on an individual's membership in a protected class that is severe and/or pervasive.

*Protected Class:* Individuals or groups protected from discrimination and harassment by law. Protected classes include gender, pregnancy, age, disability, race, color, religion, creed, national origin, veteran status, marital status, sexual orientation, and gender identity.

*Intimidating, Hostile, or Offensive Environment:* Is when the conduct is severe or pervasive enough to create a work and/or learning environment that a reasonable person would consider intimidating, hostile, or offensive. Offensive conduct may include, but is not limited to: offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, comments, staring, offensive objects or pictures. The determination of whether an environment is hostile, intimidating, or offensive must be based on all of the circumstances. These circumstances could include the frequency of the conduct, its severity, and whether it is threatening or humiliating. Simple teasing, an off-hand comment, or an isolated incident (unless extremely serious) while not necessarily illegal may still violate University policy.

*Sexual Harassment:* Includes unwelcome or unwanted sexual advances, sexual attention, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature or other offensive behavior directed toward a person because of, or on account of, his or her gender, whether by a person of the opposite or same gender. Such conduct constitutes sexual harassment when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work or academic performance, or creates an intimidating, hostile, or offensive work or learning environment. Additionally see the Sexual Misconduct & Relationship Violence Policy on p.38

*Bullying:* Is a type of harassment that is repeated, unwanted, offensive, and malicious behavior, which undermines an individual or group through persistently negative attacks. Bullying can take one or more of the following forms:

- Verbal abuse
- Offensive conduct, both verbal and nonverbal, which is threatening, humiliating, patronizing, demeaning, and/or intimidating
- Interference with and/or sabotage of work or academic performance

*Stalking:* Is a form of harassment that involves ongoing and/or continual pestering of an individual, either in person, in written or electronic formats, or on the telephone. Stalking can also involve following, spying on, alarming, or causing one or more individuals distress, and it may involve violence or fear of violence.

*Physical Assault:* Is a form of harassment and a criminal offense that brings harm to an individual by way of a physical attack. If you have been attacked, it is important that you seek help immediately. If a charge of assault is being pursued through the criminal courts, the University will determine whether and at what stage it is appropriate to initiate its internal procedures.

*Psychological Harassment*: Is behavior intended to cause distress through hostile, inappropriate, and unwanted conduct, verbal comments, actions, or gestures that affects an individual's dignity, integrity, and/or self-image. Psychological harassment has many forms, the most common being verbal abuse. Examples include constant negative remarks; repeated criticism or sarcasm; intimidation; threats; insinuations; and efforts to humiliate, circulate false information concerning, or socially isolate one or more individuals. Psychological harassment can cause physical and psychological illness.

*Retaliation:* Occurs when adverse actions are imposed against individuals who have reported allegations of harassment or discrimination or have participated in a harassment or discrimination investigation.

*Affirmative Action Officer:* The individual who may investigate allegations of discrimination, harassment, and related retaliation.

*Human Resources Representative:* A Human Resources professional from the Office of Human Resources who may investigate allegations of discrimination, harassment, and related retaliation.

*Supervisors:* A supervisor is anyone who has the authority to hire, promote, discipline, evaluate, grade, or direct faculty, staff, or students. This includes anyone who manages or supervises others, including but not limited to, faculty, teaching assistants, resident advisors, coaches, and anyone who leads, administers, advises, or directs University programs.

*Appointing Authority / Disciplinary Authority(s):* An appointing authority is the individual(s) with the authority or delegated authority to make ultimate personnel decisions concerning a particular employee. A disciplinary authority is the individual(s) who, or office that, has the authority or delegated authority to impose discipline upon a particular employee or student.

## Policy Scope

This policy prohibits harassment, discrimination, and retaliation by or against all individuals, including faculty and staff, students, all visitors, contractors, and other third parties on University property or in other University academic or related settings. Thus, the prohibitions on inappropriate behavior in this policy apply not only in the workplace and/or learning environment itself but also to all other work-related settings, such as off-site meetings, clinical rotations, internships, field work, athletic events, business trips, and business-related social functions.

The conduct of students is governed by policies described in this Student Handbook and administered by the Division of Student Affairs. The conduct of faculty, staff, visitors, contractors, and other third parties is governed by this policy and administered by the Office of Human Resources.

Students and University employees engaged in experiential learning/teaching at sites off-campus who are involved in an alleged harassment/discrimination situation, must report this to the appropriate authorities at the site.  Students and University employees are responsible for familiarizing themselves with the policies and procedures for reporting such allegations to the site.

All members of the University community are both protected under and restricted by this policy. It is important to remember that all of the conduct and behaviors prohibited under this policy apply to all oral, written, and visual communications, including but not limited to, e-mail, voice mail, Internet communications and searches, and other technology-assisted communications.

## Reporting an Incident

Harassing incidents should be reported as quickly as possible, so that the University may respond promptly, equitably, and in a manner that moves toward eliminating such behavior or conduct. The University will make every reasonable effort to ensure the confidentiality of all parties involved.

Students, staff, faculty, or third parties who experience or witness harassment involving students should contact the Office of the Dean of Students at 215.596.8950 After normal business hours or at the discretion of the individual, Campus Security may be contacted at 215.596.7000.

## Process

The Dean of Students will coordinate, as needed, with Public Safety, the AAO, or other appropriate administrators to investigate the complaint. Based on the findings, an individual may be subject to remedial, rehabilitative, and/or disciplinary action through the grievance process, student conduct process, or other administrative avenues as appropriate. (See Student Grievance Policy, p.66, or Student Conduct Policy, p. 45)

## Hazardous Materials on Campus Policy

The presence of hazardous materials poses a direct and substantial threat to the safety of our community and, therefore, is prohibited in or on any property owned, managed, leased, or controlled by the University.

## Room Reservations

Division of Student Affairs

<u>USciences Student Organizations</u>

Student Activities
Wilson Student Center – Room 210
215.596.8844

<u>Greek Organizations</u>

Greek Life
Whitecar Hall – Room 1007
267-295-3174

All organizations wishing to reserve a room anywhere on campus must contact their respective areas as indicated above.  For more details on this process, see <u>Room Reservations</u> in the Campus Life section of this Student Handbook, p. 161.

## Student Accommodations

Whitecar Hall – Suite 1110
215.596.8758

University of the Sciences supports the educational endeavors of all its students. If a student believes that he or she has a disability that may impact his or her ability to fulfill any degree requirements, or other educational endeavors, and would like more information on applying for an accommodation, please contact the Office of Student Accommodations at 215.596.8758. To learn more about the University's policy, please see the General Information and University Policies section of this Student Handbook under <u>Disability Support Services Policy</u>, p. 20

## Student Conduct

Whitecar Hall – Suite 1000
215.596.7554

The Office of Student Conduct works to ensure that students at the University of the Sciences understand the purpose of integrity, rights, and responsibilities within the University community.

The Office of Student Conduct coordinates the University conduct system, which fosters an environment that contributes to the mission and goals of the University by holding these standards at the center of all

# Exhibit B



# Philadelphia College of Pharmacy
## University of the Sciences

# STUDENT HANDBOOK
# (2016-17)

## PCP-specific information for students and faculty/staff

This handbook, published by the PCP Dean's Office, provides the most current information about the Philadelphia College of Pharmacy (PCP), the founding college of the USciences community, and its programs, policies and procedures.  It is available in electronic format on the PCP Central Repository on Blackboard, in printed form in the PCP Dean's Office in GH 2016, and at: http://www.usciences.edu/Media/Website%20Resources/documents/academics/collegesDepts/PharmPracticeAdmin/PharmD/PCP_Student_Handbook.pdf; .

The information provided herein supplements the University-wide information found in the University Student Handbook and the University Catalog and supersedes that information as it relates to PCP-specific issues.  Education, from admission through graduation, is under continuous review and quality improvement; as such, the information provided in this handbook is not considered a contract.  PCP reserves the right to alter its rules, regulations, and requirements for admission or graduation, as needed.  Communication of any modifications, revisions or updates to components of this document will be made solely via Blackboard announcement and/or University email.

Prepared by:   Diane W. Morel, Ph.D.
                        Assistant Dean, Curriculum and Assessment
                        September 1, 2016

**technical standards acknowledgement form** (see Appendix G) with their acceptance, and must return the signed form/acknowledgement prior to/upon matriculation.  The technical standards that pharmacy students must meet are a set of motor, cognitive and behavioral attributes needed to perform the 'essential functions' of a pharmacist in a reasonably independent manner and without use of a trained intermediary (i.e., a student's judgment and activities cannot be mediated by someone else's clinical skills, professional knowledge, and integrative or interpretative abilities).  Students are guaranteed reasonable accomodations under the American Disabilities Act (please see University Student Handbook for description of polices and procedures for soliciting ADA accomodations).

Entry into graduate programs  requires a previous baccalaureate degree and follows the policies and procedures for graduate programs, which are listed on the University web page.

**Change of Major**

Changing from one major field of study to another at the University is often possible, but it is neither automatic nor guaranteed.  Following consultation with his/her academic advisor, the student intending to change his/her major should meet with the college dean and program director responsible for the degree program into which the student desires to transfer.  The PCP Council Admissions Committee evaluates change of major applications into the first professional year (P1) of the Doctor of Pharmacy program, change of majors applications to the BS programs, transfer student applications into P1 of the Doctor of Pharmacy program, and readmission (for former USciences students) applications into PCP programs.  The change of major process involves submission of an application form, resume, and personal statement, followed by interview(s), most commonly with the program director or a member of the Admission Committee.  The interviewer(s) submit their recommendation(s) to the Admissions Committee, which then makes the final decision.  The readmission process is similar, but per University policy, requires supporting materials, such as completion of college coursework,  which indicate a likelihood of success (see University student handbook).  Formal requests for change of major must be submitted to the student's prospective college dean by the following dates:   October 15 (all programs except PharmD) and April 1 of each academic year.   Students who are withdrawn from the Doctor of Pharmacy program (e.g. if they cannot progress to the first professional year or are dropped from the program during the professional years) must change to a different major in the University by the end of drop/add period of the next semester, per University policy. Students must remain in that program at least four semesters before reapplying to the Doctor of Pharmacy program.  If such a student is unsure of their desired major, they can choose the  undeclared transistional program, which gives them an additional semester to apply to a new major.  For PCP programs as well as certain other University programs, students are strongly encouraged to apply for the change of major to the desired program by July 15 of each academic year to prevent being closed out if program capacity is exceeded. Application forms and information about these processes as related to PCP programs can be obtained from the PCP Dean's Office; for programs outside PCP, the specific college policies and procedures should be followed.  Starting in 2016, U4 (senior) students seeking a chance of major to the PharmD program must apply through the PharmCAS process (more information available from PCP Dean's Office).

# V.    Program Requirements and Academic Standards

**Residency:  min and max**

Students admitted into the first professional year of the program must be enrolled for at least four years (i.e., 8 semesters of at least 12 credits/semester) in residency at PCP, regardless of the extent or nature of previous academic experience. Completing the BS programs in PCP requires that students enroll at the University for at least half of the total number of credits required for graduation or that

students enroll at the University for a minimum of four fall and/or spring semesters of full time (at least 12 credits/semester) study.

The maximum amount of time to complete the BS programs in PCP is six years from freshman entry into the University to complete all degree requirements. For the PharmD program, students have a maximum of six years from entry into the first professional year (P1) of the program to complete all degree requirements. Inability to complete the degree in the allotted time frame will result in the student being withdrawn from the program. Approved leaves of absence are not counted as part of the maximum time to degree.

**Progression in PCP programs**

Progression in the PharmD program as defined by PCP faculty is the year-to-year advancement in the program, based on satisfactory completion of all coursework, achievement of minimum academic and program-specific grade point averages, and meeting any additional proficiencies in a timely manner. Thus, **students must satisfactorily complete all requirements of a given program year before advancing to the next program year**. This is of particular import in the professional component of pharmacy education because of the incremental nature of knowledge, skill, and attitude development, and the interplay between didactic coursework and experiential training. Given the integrated/coordinated nature of components of the Doctor of Pharmacy program, program year becomes an added restriction to pre-requisite and co-requisite coursework for eligibility in certain courses or experiences.

Generally, progression into the next program year can be determined after spring semester grades are complete; the registrar's office officially advances students' program year in the WebAdvisor system via a batch process prior to the beginning of the next academic year, after verification of successful completion of all required coursework and the absence of academic or conduct difficulties. In some cases, because of unsuccessful completion of a required course during the fall semester, progression will be affected earlier. Thus, lack of successful completion of one (or more) required, non-elective professional course(s) (with the prefixes PA, PC, PH or PP) **WILL** result in a delay in progression until that coursework can be successfully completed, at its next scheduled course offering (for policy, see below under course offerings and exam scheduling) . A delay in progression WILL result in a longer time to complete the program (frequently a year for courses only offered once per academic year); the anticipated graduation date will be modified in WebAdvisor to reflect such a delay in progression.

For the BS programs, a similar perspective is applied to advancement in the program, but is somewhat more flexible being based on completing a majority of program specific coursework related to a given year in the program. For many specific courses in the BS programs, program year does not determine eligibility to take specific courses; generally it is solely prerequisites and/or co-requisites. However, a delay in progression WILL result in a longer time to complete the program, and most likely delay graduation.

No one plan is optimal for students facing non-progression. To help clarify the options and identify resources available, frequently asked questions are addressed by the PCP Dean's office in Appendix H.

**Pharmacy Student to Student Pharmacist transition: pre-professional to professional phase**

For graduating classes of 2014-21 (Catalog Years 2008-15), advancement from U2 (second undergraduate year) into P1 (first professional year) occurs when the following criteria are met: all required courses since matriculation are taken at USciences; all required first- and second-year coursework is successfully completed; BOTH a minimum cumulative GPA of 3.00 and a natural science/math GPA of 2.50 are achieved by the last day of the spring semester of second year; and a professional education readiness competency (PERC) interview is successfully completed. Students who fail to meet these requirements will be withdrawn from the PharmD Program. Students with a

## VERIFICATION

The undersigned, having read the attached complaint, verifies that the complaint is based upon information furnished to counsel which information has been gathered by counsel in the course of the within lawsuit.

The undersigned verifies that she has read the complaint and that the factual averments are true and correct to the best of her knowledge, information and belief. To the extent that the language of the complaint is that of counsel and/or legal terminology, the undersigned has relied upon counsel's explanation of that language in making this verification

It is understood that the statements therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

Vivian Chen

Date: 1/7/2019